UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEEVESH KHANNA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>OHR PHARMACEUTICAL, INC., JASON SLAKTER, SAM BACKENROTH, IRACH TARAPOREWALA.<br><br>Defendants. | Case No. __________<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Jeevesh Khanna ("Plaintiff"), by his attorneys, except for his own acts, which are based on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Ohr Pharmaceutical, Inc. ("Ohr" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

**NATURE OF THE ACTION**

1. This is a federa1 securities class action on behalf of all investors who purchased or otherwise acquired Ohr common stock between June 24, 2014, and January 4, 2018, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. §78aa.). This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District.

## PARTIES

5. Plaintiff purchased Ohr common stock within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing his transactions is attached hereto as Exhibit A.

6. Defendant Ohr is incorporated in Delaware with its principal offices located 800 Third Ave, 11th Floor, New York, NY 10022. Ohr's common stock trades on the NASDAQ under the ticker symbol "OHRP."

7. Defendant Irach Taraporewala ("Taraporewala") was the Company's Chief Executive Officer ("CEO") and Director of the Company from the beginning of the Class Period to August 6, 2015.

8. Defendant Jason Slakter ("Slakter") was the CEO of the Company from August 7, 2015, until the end of the Class Period, and a Director of the Company since January 2015.

9. Defendant, Sam Backenroth ("Backenroth") was the Company's Chief Financial Officer ("CFO") at all relevant times.

10. Defendants in paragraphs 7-9 are collectively referred to herein as the "Individual Defendants."

11. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e) was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(f) approved or ratified these statements in violation of the federal securities laws.

12. Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Ohr's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents

(including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

13. As officers of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Ohr's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those

statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

15. Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Ohr common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Ohr's business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other shareholders to purchase Ohr common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### A. Company Background

16. Ohr is a clinical stage pharmaceutical company developing novel therapies for ophthalmic diseases. Ohr's lead candidate, Squalamine (or squalamine lactate ophthalmic solution, 0.2%, or OHR-102), is a novel therapeutic product aiming at providing a non-invasive therapy to improve vision outcomes.

### B. Material Misstatements and Omissions during the Class Period

17. The Class Period begins on June 24, 2014, when Ohr issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the results of its phase II clinical study of OHR-102 for patients with wet age-related macular degeneration ("Wet-AMD") ("June 2014 Press Release"). The press release stated in pertinent part:

> NEW YORK, June 24, 2014 (GLOBE NEWSWIRE) -- Ohr Pharmaceutical, Inc. (Nasdaq:OHRP), an ophthalmology research and development company, today announced positive top-line interim results for its double-masked, placebo-controlled Phase II clinical trial of Squalamine eye drops in patients with wet age-related macular degeneration (wet AMD). The data demonstrated a positive benefit in visual function across multiple clinically relevant endpoints, including a mean change in visual acuity at the end of study visit for the interim analysis group of +10.4 letters with Squalamine eye drops plus Lucentis® PRN versus +6.3 letters in

the placebo eye drops plus Lucentis PRN arm, a 65 percent additional relative benefit (p=0.18). The visual acuity improvements were seen as early as four weeks and the relative difference in visual acuity between the two treatment arms continued to increase throughout the study.

All patients in the study received an initial Lucentis injection followed by Lucentis as needed (PRN) based on clinical response. The two treatment arms were Squalamine eye drops administered twice daily plus Lucentis PRN ("Squalamine" arm or group) versus standard-of-care treatment: placebo eye drops administered twice daily plus Lucentis PRN ("placebo" arm or group).

* * *

"***The beneficial effects of Squalamine on visual acuity that we've seen thus far, through its inhibition of multiple angiogenic growth factors and pathways, and in particular, the improvement in gains of three or more lines in vision compared with the placebo group, are truly remarkable***," said Dr. Jason Slakter, Chief Medical Officer of Ohr and retina specialist at Vitreous-Retina-Macula Consultants of NY. "Visual acuity is the most clinically relevant endpoint for back-of-the-eye disorders. For wet-AMD patients, such enhanced gains of visual acuity over standard-of-care anti-VEGF treatments, and the restoration of vision lost to this devastating disease of the elderly using a convenient eye drop therapy is a very important clinical outcome."

* * *

"The interim results seen in this trial are encouraging," said Dr. Jeffrey S. Heier, Director of Vitreoretinal Service at Ophthalmic Consultants of Boston, member of Ohr's scientific advisory board, and study investigator. "The potential to treat patients with a non-invasive therapeutic option to provide additional visual acuity benefit over the current standard-of-care, and do it with a less than monthly injection frequency, would be a significant advance in the treatment of retinal neovascular disease and beneficial for our patients. We look forward to the results of the full data set and Phase III trials."

"***We are very excited by these promising interim results from this wet-AMD trial***," said Dr. Irach B. Taraporewala, President and Chief Executive Officer of Ohr. "The data further validate not only the clinical utility of non-invasive topical eye drop therapies for macular and retinal disorders, but also the soundness of our company's drug development science, and our proprietary formulation technologies that enable topical dosing to achieve positive therapeutic effects in back-of-the-eye disorders. These data give us a clear path for future registration studies, and we plan to discuss Phase III registration study design and the path forward with the regulatory authorities in the coming months."

> The company plans to present the full data from this interim analysis at an ophthalmology conference in the second half of this year, with final clinical trial data expected in the first calendar quarter of 2015.

Emphasis added.

18. On July 13, 2015, Ohr issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the "***positive results***" of its phase II clinical study of OHR-102 for patients with central retinal vein occlusion ("July 2015 Press Release"). The press release stated in pertinent part:

> NEW YORK, July 13, 2015 (GLOBE NEWSWIRE) -- Ohr Pharmaceutical, Inc. (OHRP), an ophthalmology research and development company, today announced positive final results from a Phase II investigator sponsored clinical trial of OHR-102 (0.2% Squalamine lactate ophthalmic solution) in patients with macular edema secondary to branch (BRVO) and central retinal vein occlusion (CRVO). The results demonstrated that, following an initial 10 week combination therapy treatment period, patients who continued to receive a combination of topical OHR-102 BID plus Lucentis(R) achieved greater visual acuity gains than the control group who received Lucentis alone. At week 38, the mean gain in visual acuity from baseline for patients randomized (at week 10) to treatment with OHR-102 + Lucentis PRN was +27.8 letters compared with +23.3 for patients randomized to treatment with Lucentis plus PRN alone (control group), a clinically meaningful difference of +4.5 letters. The data were presented by John Wroblewski, MD, a retina specialist at Cumberland Valley Retina Consultants on Saturday, July 11 at the 2015 Annual Meeting of the American Society of Retina Specialists (ASRS) in Vienna, Austria.
>
> "These very promising final results demonstrate a clinically meaningful treatment effect of OHR-102 combination therapy for the treatment of macular edema secondary to retinal vein occlusion," said John Wroblewski, MD, principal investigator of this Phase II study. "The 38 week data confirm a positive and meaningful effect on both visual acuity and macular edema. Importantly, continued treatment with OHR-102 combination therapy for the full 38 weeks of the study resulted in further improvements in visual gains over those patients that only received combination therapy for the first 10 weeks of the study."
>
> * * *
>
> "***The positive results of this Phase II study demonstrates the role of OHR-102 combination therapy in RVO and represent an important milestone for the development of OHR-102 in the treatment of this disease***," said Dr. Jason Slakter, Chief Medical Officer of Ohr. "This trial constitutes the second clinical study in a

> retinal vascular disorder which has shown a positive and clinically meaningful benefit in visual acuity using OHR-102 combination therapy versus an intravitreal anti-VEGF injection alone. The consistency of the efficacy data in this study, combined with the favorable safety profile of OHR-102, we believe warrants further study in a large controlled clinical trial."

Emphasis added.

19. On March 29, 2016, Ohr issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing an agreement on the Special Protocol Assessment ("SPA") with the United States Food and Drug Administration ("FDA") ("March 2016 Press Release"). Therein, the Company stated:

> NEW YORK, March 29, 2016 -- Ohr Pharmaceutical, Inc. (NASDAQ: OHRP), a clinical-stage biotechnology company developing novel therapies for ophthalmic diseases, today announced that it has reached an agreement on the Special Protocol Assessment (SPA) with the United States Food and Drug Administration (US FDA) on the design of the Phase III trial for its lead drug candidate, squalamine lactate ophthalmic solution, 0.2% ("Squalamine," also known as OHR-102). Based on the agreed upon SPA, Ohr has initiated the first of two planned Phase III global clinical studies evaluating the efficacy and safety of Squalamine, given in combination with Lucentis®, for the treatment of neovascular age-related macular degeneration (wet AMD).
>
> "We are extremely pleased to have completed the SPA process. This agreement with the FDA enables us to move forward with the Squalamine Phase III clinical program," commented Dr. Jason Slakter, CEO of Ohr. "The initiation of our Phase III clinical program is a monumental achievement for the company and represents an important step in our mission to develop and commercialize therapeutics for unmet medical needs in ophthalmology."
>
> "This is fantastic news for the retinal community and the patients in our care," said Dr. David S. Boyer, retina specialist at Retina-Vitreous Associates Medical Group, Beverly Hills, CA, and a member of Ohr's Scientific Advisory Board. "Based on my clinical experience, Squalamine is a promising drug with the potential to non-invasively improve visual function over the current standard of care. I look forward to the opportunity to enroll patients in this important clinical study."
>
> Dr. Avner Ingerman, Ohr's Chief Clinical Officer, added, "We are working with the retinal community and Ohr's Scientific Advisory Board to expeditiously implement a high-quality Phase III clinical development program to fully support future regulatory applications."

> The first of two randomized, double-masked, placebo-controlled trials will include approximately 165 centers in the United States and Canada and is expected to enroll approximately 650 treatment naïve subjects with wet AMD. The primary efficacy endpoint of the clinical trial is the change in visual function at nine months.

20. On April 10, 2017, Ohr issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing that it plan to amend its clinical trial investigating Squalamine ("April 2017 Press Release"). Therein, the Company stated:

> NEW YORK, April XX, 2017 -- Ohr Pharmaceutical, Inc. (Nasdaq: OHRP), an ophthalmology research and development company, today announced that it plans to amend the ongoing clinical trial investigating Squalamine in wet-AMD (the MAKO Study) to enable efficacy analyses by the end of calendar 2017 or early 2018. The study remains a multi-center, randomized, double-masked, placebo controlled clinical trial. The subjects enrolled in the study, over 200 in total, will continue to receive their assigned study treatment of monthly Lucentis® and either Squalamine or placebo drops twice daily, and undergo scheduled visits and assessments through nine months. The primary endpoint will be an assessment of visual acuity at nine months.
>
> "***This strategic approach should provide efficacy data by year end or early next year with the goal of confirming the benefits seen in the prior Phase 2 IMPACT study***," stated Dr. Jason Slakter, CEO. "The ongoing clinical trial has prospectively enrolled the patient population identified from the IMPACT study that has the greatest potential to benefit from Squalamine combination therapy. ***We remain excited about the potential of Squalamine, a differentiated, topical, multi-target angiogenesis inhibitor, and believe that this is the optimal approach to help patients, maximize value for shareholders, and enhance our ongoing business development efforts.***"
>
> Dr. Slakter continued, "Following the closing of the financing today, we are funded into 2018, including the completion of our ongoing clinical trial and data readout by the end of calendar 2017 or early 2018."

Emphasis added.

21. The statements in paragraphs ¶18-¶21 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (1) Ohr's lead

product Squalamine would not produce vision improvements and was commercially not viable; and (2) as a result of the foregoing, Defendants' statements about Ohr's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

**C. The Truth Emerges**

22. On January 4, 2018, after the market close, Ohr issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the efficacy results from the Company's study evaluating Squalamine's efficacy and safety ("January 2018 Press Release"). The press release stated in pertinent part:

> **Ohr Pharmaceutical Announces Efficacy Results from the MAKO Study in Wet-AMD**
>
> **NEW YORK, New York – January 5, 2018 –** Ohr Pharmaceutical, Inc. (NASDAQ: OHRP), a clinical-stage pharmaceutical company developing novel therapies for ophthalmic diseases, today reported topline data from the MAKO study which did not meet its primary efficacy endpoint. The MAKO study evaluated the efficacy and safety of topically administered squalamine in combination with monthly Lucentis® injections for the treatment of wet age-related macular degeneration ("wet-AMD"). The primary efficacy endpoint was the mean visual acuity gain at nine months, using a mixed-effects model for repeated measures (MMRM) analysis. Subjects receiving squalamine combination therapy (n=119) achieved a mean gain of 8.33 letters from baseline versus 10.58 letters from baseline with Lucentis® monotherapy (n=118). There were no differences in the safety profile between the two treatment groups.
>
> "We are very disappointed with the outcome of the MAKO study," commented Dr. Jason Slakter, chief executive officer of Ohr. "We are grateful to the patients and physicians who participated in the clinical trial. Based on these results, we intend to evaluate strategic alternatives to maximize shareholder value."

23.

24. On this news, the Company's common stock price declined $1.64 from a close on January 4, 2018 at $2.02 per common stock, to a close at $0.38 per common stock on January 5, 2018, ***a drop of approximately 81.2%.***

## ADDITIONAL SCIENTER ALLEGATIONS

25. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Ohr, their control over, and/or receipt and/or modification of Ohr's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Ohr, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

26. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's common stock. As detailed above, when the truth about Ohr's misconduct and its lack of operational and financial controls was revealed, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Ohr's common stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other

Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

27. At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Ohr's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Ohr's common stock to be artificially inflated. Plaintiff and other Class members purchased Ohr's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

**PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET**

28. At all relevant times, the market for Ohr common stock was an efficient market for the following reasons, among others:

(a) Ohr common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

(b) During the Class Period, Ohr common stock were actively traded, demonstrating a strong presumption of an efficient market;

(c) As a regulated issuer, Ohr filed with the SEC periodic public reports during the Class Period;

(d) Ohr regularly communicated with public investors via established market communication mechanisms;

(e) Ohr was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about Ohr was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

29. As a result of the foregoing, the market for Ohr common stock promptly digested current information regarding Ohr from all publicly available sources and reflected such information in Ohr's stock price. Under these circumstances, all purchasers of Ohr common stock during the Class Period suffered similar injury through their purchase of Ohr's common stock at artificially inflated prices, and a presumption of reliance applies.

30. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's financials and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in Ohr.

**NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE**

31. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

32. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

33. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Ohr who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

34. Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Ohr common stock on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

35. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ohr common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can

be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Ohr or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, as of December 13, 2017, Ohr had more than 56,196,428 shares of common stock outstanding. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

36. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

37. Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

38. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b) whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c) whether the price of Ohr common stock during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

39. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**
***Violation of Section 10(b) and Rule 10b-5 Against All Defendants***

40. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

41. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Ohr common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

42. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Ohr common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

43. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Ohr as specified herein.

44. These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Ohr's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Ohr and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Ohr common stock during the Class Period.

45. Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of

information to the investing public which they knew or recklessly disregarded was materially false and misleading.

46. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Ohr's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

47. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Ohr's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Ohr's publicly-traded common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Ohr's common stock during the Class Period at artificially high prices and were or will be damaged thereby.

48. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Ohr's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Ohr common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

49. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

50. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

51. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of common stock giving rise to the cause of action.

## COUNT II

***The Individual Defendants Violated Section 20(a) of the Exchange Act***

52. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53. The Individual Defendants acted as controlling persons of Ohr within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of

the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

54. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

55. As set forth above, Ohr, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

56. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

57. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of common stock giving rise to the cause of action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a) Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d) Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial.

Dated: February 14, 2018

/s/ Eduard Korsinsky________
**LEVI & KORSINSKY, LLP**
Eduard Korsinsky
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email:ek@zlk.com